**ORAL ARGUMENT REQUESTED**

**No. 15-4019**

═══════════════════════════════════════════

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Appellee,*

v.

ROBERT F. MCDONNELL,

*Defendant-Appellant.*

_____

**On Appeal from the United States District Court for the Eastern District of Virginia, Richmond Division, James R. Spencer, District Judge**

_____

**DEFENDANT-APPELLANT'S MOTION FOR RELEASE PENDING APPEAL**

_____

Noel J. Francisco
  *Counsel of Record*
Henry W. Asbill
Charlotte H. Taylor
James M. Burnham
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
njfrancisco@jonesday.com

John L. Brownlee
HOLLAND & KNIGHT LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564

*Counsel for Defendant-Appellant*
    *Robert F. McDonnell*

Defendant-Appellant Robert F. McDonnell moves for release pending appeal pursuant to 18 U.S.C. § 3143(b). He has been ordered to report to the Bureau of Prisons by February 9, 2015 and therefore requests expedited briefing and disposition of this matter prior to that date. Should the Court desire additional time to consider the issue, he respectfully requests a brief administrative stay of his reporting date pending this Court's disposition of this motion.[1]

This case presents the substantial issue of whether this Court is prepared to become the first court in history (besides the district court) to hold that actions not attempting to exercise any governmental power nonetheless constitute "official actions" so long as they are things that officials customarily do—a decision that would create a conflict with decisions of the Supreme Court, the D.C., First, and Eighth Circuits, as well as this Court's prior decisions, and that would revolutionize politics by dramatically expanding the general federal corruption laws to make every political fundraiser that exchanges "access" or "credibility" for campaign contributions into a federal felony. That risk is particularly acute where, as here, the district court instructed that "[t]here has been no suggestion in this case that Mr. McDonnell violated Virginia law." Tr. Vol. XXVI, at 6125. To date, the Government has not cited any in any jurisdiction with facts remotely resembling the facts here. Nor has the district court ever cited—let alone distinguished—any of the well-reasoned out-of-circuit decisions Mr. McDonnell has repeatedly invoked that show that the facts proved were not a crime and, regardless, that the jury instructions were prejudicially overbroad. Indeed, the district court *agreed with Mr. McDonnell* about several legal limits on "official action," yet never explained why it declined to tell the jury about *any* of those limits in its instructions—an omission that invited the jury to convict Mr. McDonnell for conduct that is lawful under the district court's own post-trial opinions.

---

[1] Mr. McDonnell notes for the Court's convenience that he believes one or more *amici curiae* may seek to file briefs in support of this motion for bond pending appeal.

- 1 -

The district court has, however, recognized that the Government's case against Mr. McDonnell falls well outside the heartland of public corruption cases. As the district court put it at sentencing: "Imagine if these Guidelines were mandatory and the Court had no choice but to sentence Governor McDonnell to seven or eight years in prison. That would be unfair. *It would be ridiculous under these facts*." Sent. Tr. at 175, Ex. C (emphasis added). While the district court declined to grant bond, its recognition that this case is atypical underscores the fact that Mr. McDonnell's appeal, at a minimum, presents "a 'close' question or one that very well could be decided the other way," *United States v. Steinhorn*, 927 F.2d 195, 196 (4th Cir. 1991) (granting bond pending appeal), which is all Mr. McDonnell need show here. Should this Court agree that Mr. McDonnell has made that low showing, "the statute establishes a right to liberty that is not simply discretionary but mandatory." *United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004). Mr. McDonnell's appeal will raise several questions that easily satisfy this standard.[2]

*First,* to convict Mr. McDonnell, a properly instructed jury had to find that he performed or promised to perform "official acts" in exchange for gifts and loans. There are substantial questions whether (1) the Government proved this critical element, and (2) the district court properly instructed the jury on it. The Government's theory was not that Mr. McDonnell exercised (or pressured others to exercise) actual governmental power. Instead, it alleged that Mr. McDonnell's "official acts" consisted of sending an email asking his in-house counsel to "see me" about an issue, attending two events, arranging one meeting, and suggesting one other meeting. No federal or state judicial decision has ever upheld a bribery conviction on such facts or approved instructions permitting a conviction for such customary actions that do not make (or pressure someone else to make) actual governmental decisions. To the contrary, opinions from

---

[2] Mr. McDonnell's appeal will raise additional substantial issues and he in no way concedes here that his other appellate issues are any less substantial.

the Supreme Court and the First, Eighth, and D.C. Circuits all make clear that providing a referral, sending an informational inquiry, or appearing in public are not—without more—"official acts." This issue thus obviously presents a substantial question.

*Second*, there is also a substantial question whether the district court conducted sufficient voir dire of the jurors on pretrial publicity—an issue of first impression in this Court post-*Skilling*. During the months leading up to Mr. McDonnell's trial, there was massive negative and inaccurate publicity surrounding the case. The district court, however, rejected Mr. McDonnell's request for individualized voir dire of potential jurors who had been exposed to such publicity, despite longstanding precedent holding that jurors in high-publicity cases should be "examined, individually and outside the presence of the other jurors, to determine the effect of [pretrial] publicity," *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974).

*Finally*, bond pending appeal is particularly appropriate given that the district court imposed a twenty-four month sentence. The appellate process takes time, particularly in a complex case following a five-week jury trial. In such circumstances, requiring Mr. McDonnell "to serve most or all of his sentence before his appeal has been decided" and "[i]ncarcerating [him] 'immediately upon conviction'" would "substantially diminish the benefit he would ordinarily receive from an appeal." *United States v. Garcia*, 340 F.3d 1013, 1019 (9th Cir. 2003).[3] The possibility of this grave injustice provides another compelling reason to grant bond.

## FACTUAL BACKGROUND

The Government's case below focused on Mr. McDonnell's interactions with Jonnie R.

---

[3] *See also, e.g.*, *United States v. Jackson*, 32 F.3d 1101, 1104 (7th Cir. 1994) ("[W]e would encourage defendants facing relatively short sentences to seek release pending appeal or move for an expedited appeal because it is often difficult to file an appeal, docket it, set a briefing schedule, hear oral argument, and draft an opinion before a very short sentence has been served."); *United States v. McManus*, 651 F. Supp. 382, 383-84 (D. Md. 1987) ("There seems little point to an appeal if the defendant will serve his time before a decision is rendered.").

Williams, Sr., the CEO of a Virginia public company, while Mr. McDonnell was Governor of Virginia. The Indictment charged that, in exchange for golf and loans, Mr. McDonnell took "official action" to assist Mr. Williams and his company, Star Scientific ("Star").

1.    The Government's case hinged on "five specific actions taken by McDonnell . . . ." New Trial Op. at 6, Dkt. 567; *see also* Tr. Vol. XXV at 6040-42. They were:

(1)    Mr. McDonnell sent an email to his chief counsel asking the counsel to "see me" about an issue related to Mr. Williams. (The counsel never actually saw him.) *See* Tr. Vol. VII, at 1665-68.

(2)    Mr. McDonnell's wife invited Mr. Williams, some of Mr. Williams' associates, and private doctors recommended by Mr. Williams to a reception for "Healthcare Leaders." (Nothing else happened.) *See* Tr. Vol. IV, at 761-63, 783-85; Tr. Vol. IX, at 2121, 2165.

(3)    Mr. McDonnell possibly suggested to two subordinates that they meet with Star. (The subordinates disagreed about whether Mr. McDonnell made the request, they never met with anyone, and they never heard about it again from Mr. McDonnell or anyone else.) *See* Tr. Vol. XI, at 2654-55, 2675-76; 2679-80, 2668-69.

(4)    Mr. McDonnell asked a subordinate to send a staffer to a meeting with Mr. Williams, immediately after which the staffer sent Mr. Williams a "blow-off email." (Nothing else happened.) *See* Tr. Vol. VII, at 1492-93, 1507-08, 1517-18 (the email was "'No' with a smile"), 1522, 1507:8-22; *id.* at 1517:22-1518:2.

(5)    Mr. McDonnell appeared at a luncheon held at the Executive Mansion and paid for by his PAC, featuring Mr. Williams and researchers from the University of Virginia ("UVA") and Virginia Commonwealth University ("VCU"), at which Mr. Williams presented a portion of $200,000 from Star to those researchers as planning grants to prepare Tobacco Commission research proposals. (No proposals were ever submitted, nobody from the McDonnell Administration ever mentioned them again, nor did anyone ever contact the Commission.) *See* Tr. Vol. IV, at 727-28, 733-34; Tr. Vol. VIII, at 1793-95, 1810-12.

Mr. McDonnell repeatedly argued that none of these actions qualify as "official acts" because in none of them did he make, nor pressure someone else to make, any actual decision or take any other action on any pending governmental matter.[4] He requested numerous instructions

---

[4] In addition to moving to dismiss the indictment on this basis, *see* Mem. Def. Mot. to Dismiss Counts 1-11 of the Indictment, Dkt. 106, at 7-19, he moved for a new trial on this

reflecting that legal principle, including ones specifying that "merely arranging a meeting, attending an event, hosting a reception, or making a speech are not, standing alone, 'official acts,' even if they are settled practices of the official," Robert F. McDonnell's Prop. Jury Instructions, Dkt. 287, at 79; that "[t]he questions you must decide are both whether the charged conduct constitutes a 'settled practice' *and* whether that conduct was intended to or did in fact influence a specific official decision the government actually makes," *id.* at 79-80; and that "mere ingratiation and access are not corruption," *id.* at 79.

The district court refused these requests and declined to provide a definition of "official act" that limited it in any relevant way, even though this legal issue went to the heart of Mr. McDonnell's defense. Instead, after quoting the statutory definition of "official action" from 18 U.S.C. § 201(a)(3),[5] the district court stated (Tr. Vol. XXVI, at 6102:23-6103:14):

> Official action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law. In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description. And a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end sought by the bribe payor. In addition, official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end.

2. Seizing on the unqualified statement that the statutory definition of "official action" "*includes those actions* that have been clearly established by settled practice as part of a public

---

(continued…)

ground, *see* Mem. Def. Mot. for New Trial, Dkt. 548, at 2-11, and three times moved for an acquittal on it, *see* Dkt. 409, at 12-17; Trial Tr. Vol. XXIV, at 5731-33; Dkt. 510, at 3-15.

[5] The statute prohibiting bribery for federal officials defines "official act" as follows: "[A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity. . . ." 18 U.S.C. § 201(a)(3).

official's position"—and the expansion of it—the Government opened its rebuttal argument by telling the jury: "Mr. Asbill talked about defining quo. . . . But what he failed to mention is that official action . . . includes those actions that have been clearly established by settled practice as part of a public official's position . . . . In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule or job description." *Id.* at 6039. Given that the status of Mr. McDonnell's actions as settled practices was not disputed—since governors unthinkingly make dozens of meeting referrals and send thousands of emails every week—the *only purpose* of that argument was encouraging the jury to convict Mr. McDonnell *solely* for engaging in settled practices. The jury obliged, convicting Mr. McDonnell on eleven counts for committing, and conspiring to commit, honest services wire fraud and Hobbs Act extortion, while acquitting him of the non-corruption charges.

3. The district court denied Mr. McDonnell's post-trial motions for a judgment of acquittal and a new trial. It conceded that "mere '[i]ngratiation and access' may not alone create a quid pro quo agreement within the meaning of the bribery statutes," New Trial Op., Dkt. 567, at 5 (quoting *Citizens United*, 558 U.S. 310, 360 (2010)), but nonetheless upheld Mr. McDonnell's convictions, invoking an (inapposite) Sixth Circuit dissent to hold that "to distinguish between mere access and federal corruption, the Court should look to McDonnell's subjective intent in receiving the money." *Id.* (citing *United States v. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014) (Merritt, J., dissenting)). On this basis, the district court ruled that such actions as emailing his chief counsel, or suggesting a meeting with Star representatives, qualify as "official acts" because Mr. McDonnell supposedly had the overarching intent of doing things "to legitimize, promote, and obtain research studies for Star Scientific products," *id.* at 5-7—an alleged overarching intent that the district court's instructions *did not require the jury to find*.

On January 13, 2015, the district court denied bond pending appeal.  *See* Ex. A.

## ARGUMENT

The standard for granting bond pending appeal—where, as here, there is no risk of flight, no danger to the community, and the appeal is not taken solely for purposes of delay—is merely whether the appeal presents "a substantial question of law or fact" that, if successful, is "likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *United States v. Miller*, 753 F.2d 19, 24 (3d Cir. 1985).  Mr. McDonnell need not show he is likely to succeed on the merits; rather, he need show *only* that his appeal presents "a 'close' question or one that very well *could be* decided the other way." *Steinhorn*, 927 F.2d at 196 (emphasis added).  Appellate courts thus routinely grant defendants like Mr. McDonnell bond pending appeal in light of the substantial questions that arise when the vague federal corruption laws are applied to novel facts[6]—even where, as in *Jefferson* and other complex cases, they ultimately affirm the convictions.[7]  Indeed, just last Friday, the First Circuit granted bond in a similar pending public corruption case.  *See* Order, *United States v. O'Brien*, Case No. 14-2312, Ex. D.  It is thus no surprise this Court regularly grants bond pending appeal where, as here, the defendant satisfies § 3143(b).  Mr. McDonnell's appeal likewise clears this low hurdle.

---

[6] *See, e.g.,* Order, *United States v. Jefferson*, No. 07-CR-209 (E.D. Va. Nov. 18, 2009), Dkt. 619 (granting bond pending appeal on question whether certain actions constituted "official" actions under federal law); Order, *United States v. Ring*, No. 08-CR-274 (D.D.C. Oct. 26, 2011), Dkt. 297, at 3 ("challenging and novel questions of law regarding" the application of the federal bribery laws in the lobbying context); Order, *United States v. Siegelman*, No. 07-13163-BB (11th Cir. Mar. 27, 2008), Ex. D to Mem. in Support of Def. Robert F. McDonnell's Mot. for Release Pending Appeal, Dkt. 602 (adequacy of the jury instructions governing Hobbs Act conviction of former Alabama governor); Order, *United States v. Ryan*, No. 06-3528 (7th Cir. Nov. 28, 2006) (former Illinois governor).

[7] *See United States v. Gupta*, 747 F.3d 111, 122, 140 (2d Cir. 2014); *United States v. Siegelman*, 640 F.3d 1159, 1190 (11th Cir. 2011); *United States v. Nacchio*, 555 F.3d 1234, 1259 (10th Cir. 2009); *United States v. Warner*, 498 F.3d 666, 704-05 (7th Cir. 2007); *see also, e.g.*, *United States v. Taft*, No. 04-05130 (Feb. 28, 2005), Dkt. 31; *United States v. Elliot*, No. 02-04836 (Nov. 1, 2002), Dkt. 14; *United States v. Parker*, No. 01-04109 (Feb. 21, 2001), Dkt. 10; *United States v. Robinson*, No. 95-07620 (April 17, 1996), Dkt. 17.

I.   **There Is A Substantial Question Whether Mr. McDonnell Performed Or Promised To Perform An "Official Act."**

Mr. McDonnell's appeal presents the substantial question whether a public official takes "official action" when he asks an aide a question, encourages a staffer to attend a meeting, or appears at a private, closed-press event, without taking the additional step of asking anyone to take any particular action on the government's behalf.  This case is the first in history to find that these sorts of actions are "official" ones under federal law.  Decisions of the Supreme Court, the Eighth, First, and D.C. Circuits, and this Court all support Mr. McDonnell's position that his actions were not "official" ones.  Those decisions make this a paradigmatic substantial question.

A.   **The Supreme Court Has Held That "Official Action" Does Not Include Everything A Public Official Does In His Official Capacity.**

The Supreme Court has long been hostile to expansive constructions of the federal corruption laws.  In "an area where precisely targeted prohibitions"—like ethics regulations— "are commonplace," a corruption statute "that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."  *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 412 (1999).  Courts "ought not expand [the bribery] piece of the regulatory puzzle so dramatically as to make many other pieces misfits."  *Id.*  Or in rejecting the old honest-services theory:  "Rather than construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials, we read § 1341 as limited in scope to the protection of property rights."  *McNally v. United States*, 483 U.S. 350, 359 (1987).

The Court's most recent review of these statutes in *Skilling v. United States*, 561 U.S. 358 (2010), unanimously rejected the Government's attempt to exploit the vagaries of honest services fraud, holding it "criminalizes only the bribe-and-kickback core of the pre-*McNally* case law."  *Id.* at 409.  Notably, the debate was not about whether the Government's theory was correct—all

agreed it was not. It was, instead, between justices who believed the statute could be construed narrowly, *id.*, and those who thought it unconstitutionally vague, *id.* at 425 (Scalia, Thomas, Kennedy, JJ., concurring in the judgment). Either approach supports Mr. McDonnell here.

The Supreme Court's decision in *Sun-Diamond* further supports Mr. McDonnell's position. There, the Government argued that the gratuities statute "requires only a showing that a 'gift was motivated, at least in part, by the recipient's capacity to exercise governmental power or influence in the donor's favor' without necessarily showing that it was connected to a particular official act." 526 U.S. at 405-06. The Court rejected that broad construction, explaining that when interpreting corruption provisions which are "merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials," courts should give those provisions "a narrow, rather than a sweeping," interpretation. *Id.* at 409. Consistent with that guidance, the Court explained that under the statutory definition of "official act," many of a public official's actions—such as "receiving [] sports teams at the White House, visiting [a] high school, and speaking to [] farmers about USDA policy"—"while they are assuredly 'official acts' in some sense—are not 'official acts' within the meaning of the statute." *Id.* at 407.

Here, the Government's legal theory and the district court's jury instructions ignore the basic teaching of these decisions. Rather than restrain itself to prosecuting conduct in "the bribe-and-kickback core of the pre-*McNally* case law," *id.* at 409, the Government has taken the position that bribery captures routine political conduct that virtually every public official undertakes on a regular basis. "[C]ampaign contributions … no less than any other payments," can be the *quid* in a *quid pro quo* bribery scheme. *United States v. Derrick*, 163 F.3d 799, 816-17 (4th Cir. 1998). That means that if providing referrals to other government officials or

conferring credibility constitute "official acts," then virtually every political fundraiser violates the federal bribery laws, freeing prosecutors to choose targets at will.[8]  That theory is incorrect, particularly in light of the Supreme Court's recognition that the First Amendment protects this sphere of political activity, such that "government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1441 (2014).  At the very least, the correctness of that theory presents a substantial question under § 3143(b).

### B.    Mr. McDonnell's Position Is Supported By Decisions From Three Other Courts of Appeals And Is Distinguishable From *Jefferson*.

Numerous federal appellate court decisions support Mr. McDonnell's position.  The district court's opinions do not even cite—much less attempt to distinguish—these rulings.  And *Jefferson*, the case that the district court and the Government do rely on, is not on point.  These decisions establish a paradigmatic "substantial question" under § 3143(b).

1.    **Eighth Circuit.**  *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by* 483 U.S. 350 (1987), *superseded by statute*, 18 U.S.C. § 1346, an honest services fraud and Hobbs Act case, directly supports Mr. McDonnell's position.  There, the Eighth Circuit reversed the Hobbs Act conviction of Missouri's Speaker of the House who "offered, for a fee . . . , to introduce [an architectural] firm to [state officials] who might be able to secure architectural contracts for it."  *Id.* at 1020.  The court held that was not enough to

---

[8]  Government officials routinely confer increased access and credibility on their supporters.  *See, e.g.*, Jim Kuhnhenn, *Barack Obama Goes to DreamWorks, Talks Banjo with Steve Martin*,  Huffington Post (Nov. 26, 2013) ("[President] Obama toured the DreamWorks Animation studio of one of his top political benefactors, Jeffrey Katzenberg . . . 'Can't wait to see your next movie,' Obama added with a grin."), http://tinyurl.com/oov9z73.  That includes officials who accept personal benefits like free travel—the gravamen of most convictions here. *See, e.g.*, Maddy Sauer, *Crackdown Proposed on Judges' Free Trips, Lavish Gifts*, ABC News (Feb. 4, 2008) ("[C]ritics say many of these trips are little more than judicial junkets which often cause serious conflicts of interest."), available at http://goo.gl/7cHydk.

support a conviction: "[W]hile Rabbitt's influence obviously helped these architects obtain state jobs, no testimony established that any state contracting officer awarded any contract to Berger-Field because of Rabbitt's influence or that Berger-Field believed Rabbitt's introduction was enough to secure the work." *Id.* at 1028. As the Eighth Circuit has subsequently explained, it reversed Mr. Rabbitt's conviction because he "promised only to introduce the firm to influential persons" and "did not promise to use his official position to influence those persons." *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993).

*Rabbitt* supports Mr. McDonnell's argument that taking an official act requires more than arranging meetings so that the benefactor can discuss a matter he is concerned about. The Eighth Circuit held that it was not enough for Mr. Rabbitt to recommend bribe payors "to state contractors as qualified architects and thereby gain them a friendly ear" in pursuit of their goal of "obtain[ing] state jobs." 583 F.2d at 1028. To take "official" action, the official had take the *next* step of "us[ing] his official position to influence those persons." *Loftus*, 992 F.2d at 796.

2. **First Circuit.** The First Circuit's decision in *United States v. Urciuoli*, 513 F.3d 290, 295-96 (1st Cir. 2008), an honest-services fraud case, also strongly supports Mr. McDonnell's position. There, the court reversed the conviction of a state senator who took payments in exchange for contacting "mayors and other local officials urging them to comply with Rhode Island law" in a way that benefited the alleged bribe-payor's hospital. *Id.* at 294. Judge Boudin's opinion for the court held that there was "no indication that [the senator] invoked any purported oversight authority or threatened to use official powers in support of his advocacy." *Id.* at 296. It specifically rejected the notion that "trad[ing] . . . on the reputation, network and influence that comes with political office" or using the "access and attention" that comes with a government title, or even the "(possibly improper) use of senate letterhead" were

sufficient—standing alone—to qualify as improper official action. *Id.* at 296.

That decision conflicts with the Government's position. Here, too, there is no evidence (or jury instruction requiring a finding) that Mr. McDonnell ever "invoked any purported oversight authority or threatened to use official powers." *Id.* Moreover, the evidence in *Urciuoli* made clear that the defendant made payments to the public official specifically in exchange for obtaining access as part of a broader plan to convince mayors to increase ambulance service to the defendant's hospital. *See id.* at 292, 295. Despite a clear *quid pro quo* and larger plan, it was not honest services fraud because the Government had not shown "by context or threat that [the official] sought deliberately to exploit" the "leverage" of his public office. *Id.* at 296.

**3.    D.C. Circuit.** The leading D.C. Circuit decision on this issue is its *en banc* opinion in *Valdes*. There, a policeman was convicted of taking payments in exchange for using an official police database to perform searches for license plates, "ostensibly to get contact information on individuals who owed [the bribe-payor] money." *Valdes v. United States,* 475 F.3d 1319, 1321-22 (D.C. Cir. 2007) (en banc). The D.C. Circuit held that conducting these searches for the alleged bribe-payor was not "official action." In so holding, the court rejected the Government's argument "that the bribery and gratuity statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official." *Id.* at 1322. The meaning of "official act" did not subsume "officials' moonlighting, or their misuse of government resources, or the two in combination"; rather, the Government must prove that the defendant exerted "inappropriate influence on decisions that the government actually makes." *Id.* at 1324-25; *see also, e.g.*, *United States v. Muntain*, 610 F.2d 964, 967-68 (D.C. Cir. 1979) (vacating convictions and explaining "[t]o the extent that [defendant's] use of his official position to promote a purely private venture created an appearance of impropriety, his conduct is

reprehensible, but it is not criminal."); *United States v. Ring*, 706 F.3d 460, 470 (D.C. Cir. 2013) (explaining the crucial difference between "making a purely informational inquiry" and acting in one's "official capacity to influence" a governmental decision).

The contrast between the D.C. Circuit's rule and the rule applied below is vividly illustrated by comparing the jury instructions here to the instructions Judge Ellen Huvelle gave in *Ring*. There, Judge Huvelle instructed: "Standing alone, providing gifts of meals and tickets to public officials are not crimes, even if they are provided by someone seeking to curry favor or influence with those officials." Trial Tr. Day 12, *United States v. Ring*, No. CR 08-274 (D.D.C. Nov. 3, 2010), Dkt. 270, at 36:8-39:21, Ex. E. She also instructed that "[t]he fact that gifts or hospitality might make a public official willing to take a lobbyist's phone call or might provide the lobbyist greater access to the official's appointment schedule is not enough by itself to demonstrate the lobbyist's intent to . . . deprive the public of the government official's honest services," *id.*, and that the "six terms, question, matter, cause, suit, proceeding, or controversy, refer to a class of questions or matters whose answer or disposition is determined by the Government." *Id.* And most importantly: "Mere favoritism, as evidenced by a public official's willingness to take a lobbyist's telephone call or to meet with a lobbyist is not an official act." *Id.* Here, the district court refused to instruct on these limits, even though they were central to the defense, and even though the district court's post-trial opinions themselves endorsed and relied on many of them.

**4.** *United States v. Jefferson*. The district court has never addressed the foregoing decisions. Instead, it relied on *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012). *See* New Trial Op., Dkt. 567, at 9-11. *Jefferson*, however, is both factually and legally distinguishable.[9]

_____

[9] If it were not, *Jefferson* would conflict with *Rabbitt*, *Urciuoli*, and the other cases

On the facts, Congressman Jefferson engaged in "official acts" even under Mr. McDonnell's definition. Congressman Jefferson plainly used his status as a Congressman with "oversight authority" over domestic government agencies and foreign aid as a tool "in support of his advocacy" to, among other things, (1) pressure Export-Import Bank officials to award financing to the bribe-payor; (2) persuade the U.S. Army to award military contracts to the bribe-payor; and (3) pressure Nigerian government officials to award government contracts to the bribe-payor. Take, for example, his efforts on "African trade issues." Among other things, "[i]n return [for payments], Jefferson sent letters on official letterhead, conducted official travel to Ghana, and met Ghanaian government officials to promote the interests of" the bribe-payor, 674 F.3d at 342; he attended meetings in which he "urged Nigeria's support for [the bribe-payor's] venture, *id.* at 343; and he "assured [the bribe-payor] that he could secure the necessary cooperation of the Nigerian government," *id.* at 344. This list goes on. *See, e.g.*, *id.* at 341-51. *Jefferson* thus was a textbook case of a legislator "invok[ing his] purported oversight authority [and] threaten[ing] to use official powers in support of his advocacy." *Urciuoli*, 513 F.3d at 296.

And on the law, these factual differences underscore how *Jefferson* resolved an entirely different legal issue than the ones Mr. McDonnell will raise. As this Court explained there, Mr. Jefferson was making the "broad assertion that *Sun-Diamond* supersedes *Birdsall*" and, therefore, that "official acts" were limited only to formal legislative duties. *Jefferson*, 674 F.3d at 356. Here, by contrast, Mr. McDonnell has never questioned the vitality of *Birdsall* or, more specifically, that settled practices *can be* "official acts" if they otherwise involve "invok[ing] … purported oversight authority or threaten[ing] to use official powers in support of … advocacy,"

_____

(continued…)

discussed above—a traditional ground for en banc and Supreme Court review, *see* Fed. R. App. P. 35(b)(1)(B); Sup. Ct. R. 10(a), that would itself raise a substantial question.

*Urciuoli*, 513 F.3d at 296. Instead, Mr. McDonnell challenges only whether his actions satisfy the statutory definition of "official action"—*i.e.*, whether they are "decisions" or "actions" on any pending "matter." *That* issue finds support in the out-of-circuit cases Mr. McDonnell has cited, was not addressed in *Jefferson*, and will thus present a substantial question of law.

### C.    It Is, In Turn, A "Substantial Question" Whether The Verdict Was Sound.

Decisions of the Supreme Court, three other circuits (which the district court never addressed), and this Court thus all support Mr. McDonnell's understanding of the law. And if that understanding is correct, an acquittal or new trial is necessary. The Government did not prove, and the jury instructions did not require finding, that in the "five specific actions taken by McDonnell," D. Ct. New Trial Op. at 6, he "invoked any purported oversight authority or threatened to use official powers in support" of Mr. Williams. *Urciuoli*, 513 F.3d at 296. At the very least, both of these issues present substantial questions under § 3143(b).

### 1.    There Is A Substantial Question Whether The Jury's Verdict Was Supported By The Evidence Under The Proper Legal Standard.

The Government called no witness who testified that Mr. McDonnell tried to influence him or her to make any decision on the Commonwealth's behalf, much less that he "threatened to use official powers in support of his advocacy," *Urciuoli*, 513 F.3d at 296. In fact, every relevant witness testified to the contrary:

- Mr. Eige, the recipient of the email, testified that Mr. McDonnell "never followed back up with me or never pushed back or never directed me to actually go forward and try to make something happen with the universities." Tr. Vol. VII, at 1668.

- No witness testified that Mr. McDonnell did anything at the Healthcare Leaders Reception to encourage anyone—public official or private physician—to do anything whatsoever with respect to Star or Anatabloc, or that he even mentioned Star.

- The staffer who thought Mr. McDonnell asked her to meet with Star testified that she did not think he wanted her to do anything besides meet with Mr. Williams and make her own decision about what (if anything) to do. *See* Tr. Vol. XI, at 2680 (Ms. Hicks-Thomas) ("Q: Governor McDonnell never came back to you and said 'Did you meet

with them? Did you take care of that?' A: Never.").

- The staffer who actually did meet with Mr. Williams sent him a "blow off" email within hours of the meeting and had "no doubt" that she was free to do precisely that. Tr. Vol. VII, at 1517:10-25 (Ms. Huffstetler); *id.* at 1524:10-14.

- The university researchers who attended the mansion lunch testified they did not think Mr. McDonnell wanted them to do anything in particular.  *See* Tr. Vol. VIII, at 1795 (Dr. Lazo) ("I think the Governor's position was more of an interrogative type of a sort of questioning rather than 'Isn't this great?' or 'Isn't it this awful?'"); Tr. Vol. VII, at 1582 (Dr. Clore) ("[T]he gist of the conversation was the Governor spoke at a high level about health and wellness in Virginia and the compound, I suppose.").

The evidence thus showed only that Mr. McDonnell wanted people to make independent judgments about what to do.  As Molly Huffstetler, the only staffer to actually meet with Mr. Williams during the alleged conspiracy, testified:  She was "empowered to make [her] own decision about what to do going forward if at all here with Mr. Williams."  Tr. Vol. VII, at 1517.

## 2.    There Is Also A "Substantial Question" Whether The Jury Instructions Were Prejudicially Overbroad.

Separate and apart from whether a jury *could have* found sufficient evidence to convict Mr. McDonnell under the correct legal standard, the district court failed to require *this* jury to make any such finding.  The instructions declined to inform the jury of its obligation to find that Mr. McDonnell crossed the line drawn in *Urciuoli*, *Rabbitt*, *Valdes*, etc.  The district court declined to inform the jury about such limitations even though *it relied directly on them* in its post-trial opinions, agreeing with Mr. McDonnell that "mere '[i]ngratiation and access' may not alone create a quid pro quo agreement within the meaning of the bribery statutes."  New Trial Op., Dkt. 567, at 5.  Though the district court repeatedly endorsed this principle *post*-trial, it has never explained why it *rejected* Mr. McDonnell's proposed instruction making the same point *during* the trial.  *See* McDonnell Prop. Instr. No. 58 ("[M]ere ingratiation and access are not corruption."), Dkt. 287.  Same for the district court's post-trial recognition that the Government needed to prove that Mr. McDonnell "attempted to use his gubernatorial position to influence

- 16 -

governmental decisions," Trial Op., Dkt. 567, at 7; the court rejected an instruction conveying that precise rule. *See* McDonnell Prop. Instr. No. 58 ("The questions you must decide are both whether the charged conduct constitutes a 'settled practice' and whether that conduct was intended to or did in fact influence a specific official decision the government actually makes."). The district court even declined to tell the jury that "the fact that an activity is a routine activity, or a 'settled practice,' of an office-holder does not alone make it an 'official act,'" *id.*—an omission the Government aggressively exploited, *see supra* 5-6—that conflicts with *Jefferson*'s holding that "the jury could not rely exclusively on [ ] settled practices." 674 F.3d at 357.[10]

This instructional error went to the heart of Mr. McDonnell's defense. Mr. McDonnell never disputed that his actions were settled practices, since referring people for meetings, asking aides questions, and attending events are things governors reflexively do hundreds of times a week. His central argument, rather, was that his actions were not "official" because none sought to inappropriately influence any governmental decision. The Government capitalized fully on the instructional error to circumvent this defense—arguing to the jury that it need *not* find any effort to influence any governmental decision. *See* Tr. Vol. XXV, at 6042 ("[Y]ou look for the word pressure. It doesn't appear anywhere."). It argued that Mr. McDonnell "didn't have to say a single thing" at the Mansion event because his mere presence conferred "credibility" on Star. *Id.* at 5843-44, 5845. Similarly, the Government argued it was irrelevant that no request for action followed from Mr. McDonnell's suggested meeting. "[Defense counsel] said that nothing came out of it. But, ladies and gentlemen, that's not the point. The Governor of Virginia is . . .

---

[10] The district court reiterated its agreement with these legal principles in its recent Order denying bond. That Order repeats that "Mr. McDonnell attempted to use his gubernatorial office to influence governmental decisions in favor of Star Scientific" and asserts that "Mr. McDonnell assuredly did more than provide mere access to Williams." Ex. A at 2. Mr. McDonnell disagrees with these conclusions, of course, but once again the district court did not even attempt to explain why it declined to communicate these critical limitations on "official action" to the jury in its jury instructions.

saying, 'You should meet with them.'" *Id.* at 6042:6-11. The Government argued it was enough that "Mr. McDonnell's involvement with every single one of these things was in his official capacity as Governor." *Id.* at 5870:2-3. It argued that even the email to Mr. Eige counted as an "official act" because: "He's emailing. He's doing something." *Id.* at 6041:8.

Not only that, but the district court gave an unwieldy instruction that no other court has given, which improperly expanded and modified the "settled practice" instruction. The court instructed that "official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description," that "a public official need not have actual or final authority over the end result sought by a bribe payor so long as the alleged bribe payor reasonably believes that the public official had influence, power or authority over a means to the end," and "official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." Tr. Vol. XXVI, at 6103. These instructions thus invited the jury to conclude that any customary action, any act "in a series of steps to exercise influence *or* achieve an end," or even any act that Mr. Williams claimed he "reasonably believe[d]" was a "means" to some unspecified "end" (whatever that means) was automatically an "official act."

At the very least, however, whether the broad "official act" instruction—unaccompanied by *any* limitations remotely akin to *Ring* or the principles in *Urciuoli*, *Rabbitt*, and *Valdes*—was error is plainly a substantial question of law.[11] The instructions thus present a second substantial

---

[11] The Government has argued that the instruction here is the same as in *Jefferson*. False: *Jefferson* never approved anything like these expansions. *See* 674 F.3d at 357 (quoting the pertinent instruction). But regardless, it is black letter law that "[j]ury instructions should be drawn with reference to the particular facts of the case on trial," *United States v. Holley*, 502 F.2d 273, 276 (4th Cir. 1974), because "[a]bstract propositions of law stated to the jury without regard to the factual circumstances are potentially confusing." *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1421 (4th Cir. 1991). Appellate courts thus routinely reverse trial courts for relying on instructions that the court of appeals has previously approved in cases with different facts. *See,*

legal question which, if decided in Mr. McDonnell's favor, warrants a new trial on all counts.

## II.    There Is A "Substantial Question" Whether This Court's Voir Dire Of The Jury On Pretrial Publicity Was Adequate.

Trial courts abuse their discretion in conducting voir dire on pretrial publicity if (1) the "pretrial publicity about the case raised a significant possibility of prejudice" and (2) "the district court's voir dire procedure failed to provide a reasonable assurance that prejudice would be discovered if present." *United States v. Pratt*, 728 F.3d 463, 470 (5th Cir. 2013). Here, it is undisputed that there was a great deal of negative publicity during the run-up to Mr. McDonnell's trial. *See* Mem. in Supp. Mot. Voir Dire Relief, at pp. 2-12, Dkt. 110 (gathering examples). Both sides thus suggested individualized voir dire for jurors who admitted exposure to publicity, to ensure discovery of prejudice.[12] The district court declined. Tr. Vol. I, at 139.

Instead, the district court limited its voir dire on pretrial publicity to two questions. After acknowledging that the "case has generated a lot of media interest" the court asked the room full of prospective jurors to stand up "if you have read, heard or seen something in the media." *Id.* at 140. Almost everyone stood. The district court then said: "Based on what you have heard or read or seen relating to this case, if you are, in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down." *Id.* at 141. Everyone sat. *See id.* The court then stated that it was "satisfied with . . . the responses," *id.* at 141, and rejected repeated requests for individualized inquiry, *see id.* at 139

---

(continued…)

*e.g.*, *United States v. Regan*, 937 F.2d 823, 828 (2d Cir. 1991) ("[A] charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts."); *United States v. Lung Fong Chen*, 393 F.3d 139 (2d Cir. 2004) (instructions regarding intent in bank funds case not appropriate for cases involving more complex transactions). And this case presents starkly different facts *and* legal arguments than *Jefferson*.

[12] *See* Tr. Vol I, at 137 ("[I]t might be advisable for us to do some limited inquiry or bring them up or something . . . .") (Government); *id.* at 138-39 (same) (defense).

("[I]f somebody is exposed to pretrial publicity, they have to be individually voir dired.").[13]

It is a substantial question whether that was enough. This Court has endorsed the following procedure: "'[T]he court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity.'" *United States v. Hankish*, 502 F.2d 71, 77 (4th Cir. 1974). That is why, in *United States v. Bakker*, 925 F.2d 728, 733-34 (4th Cir. 1991), the trial court "questioned potential jurors about exposure to pre-trial publicity including specific media reports, about exposure to the opinions of others, about the juror's personal opinions about the case, and about whether media attention during the trial would influence a juror's decisions" and this Court held that such "careful" voir dire was "proper." Courts have thus set aside convictions where trial judges relied "solely on a juror's assertion of impartiality." *Pratt*, 728 F.3d at 470. Should this Court agree with Mr. McDonnell, he will be entitled to a new trial. *See, e.g.*, *United States v. Beckner*, 69 F.3d 1209, 1293-94 (5th Cir. 1995); *Skilling*, 561 U.S. at 438 (Sotomayor, J., dissenting) ("The majority [ ] envisions a fixed point at which public passions become so intense that prejudice to a defendant's fair-trial rights must be presumed."). This issue thus provides another basis for bond.

## CONCLUSION

Mr. McDonnell respectfully requests that the Court grant him bond pending appeal.

---

[13] The final jury questionnaire, from which the court excluded many of the requested questions, did not cure this problem because the court declined to ask prospective jurors whether their exposure to pretrial publicity had caused them to form an opinion about guilt or innocence. *See, e.g.,* Ex. C to New Trial Mem., Dkt. 548, at 31. Instead, it simply asked whether they had "expressed" an opinion to a third party. Ex. B to New Trial Mem., Dkt. 548, at 23. The questionnaire thus did not identify those prospective jurors who kept their opinions to themselves. Defense counsel accordingly objected that the court had no basis for determining which jurors were biased by pre-trial publicity save those who had expressed their bias to third parties. *See* Tr. Vol. I, at 139, 141 ("I can't make any judgments or arguments to you without any further inquiry."). Thus, nobody ever asked about "the impact" that "both past and future media attention would have upon potential jurors." *Bakker*, 925 F.2d at 733.

Dated: January 14, 2015                  Respectfully submitted,


                                         /s/ Noel J. Francisco
                                         Henry W. Asbill
                                         Noel J. Francisco
                                         Charlotte H. Taylor
                                         James M. Burnham
                                         JONES DAY
                                         51 Louisiana Avenue, N.W.
                                         Washington, D.C. 20001
                                         Telephone: (202) 879-3939
                                         Facsimile: (202) 626-1700

                                         John L. Brownlee (VSB No. 37358)
                                         HOLLAND & KNIGHT LLP
                                         800 17th Street, N.W.
                                         Suite 1100
                                         Washington, D.C. 20006
                                         Telephone: (202) 828-1854
                                         Facsimile: (202) 955-5564

                                         *Counsel for Robert F. McDonnell*

## STATEMENT REGARDING ORAL ARGUMENT

Mr. McDonnell respectfully requests oral argument. Allowing counsel to present oral argument would permit the Court to inquire about whatever issues in this case's voluminous record it may deem critical to deciding this motion. Given the vital importance of this issue to protecting Mr. McDonnell's legal right to an effective appeal, in light of his twenty-four-month sentence, he respectfully submits that oral argument would be appropriate.

Mr. McDonnell and his counsel note that the Court has an upcoming argument calendar on January 27-29. Mr. McDonnell's counsel can be available to present argument on any day at any time during that calendar, at the Court's convenience.

**CERTIFICATE OF SERVICE**

I certify that on January 14, 2015, the foregoing Motion for Release Pending Appeal was

served on counsel of record for all parties through the CM/ECF system

Dated: January 14, 2015

/s/ Noel J. Francisco
Noel J. Francisco
*Counsel for Robert F. McDonnell*