No. 15-4019

In the
United States Court of Appeals
for the Fourth Circuit

UNITED STATES,

*Plaintiff-Appellee,*

v.

ROBERT MCDONNELL,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA AT RICHMOND

**AMICUS CURIAE BRIEF OF THE REPUBLICAN GOVERNORS PUBLIC
POLICY COMMITTEE IN SUPPORT OF APPELLANT AND REVERSAL**

Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __15-4019__      Caption: _United States v. Robert McDonnell_____

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Republican Governors Public Policy Committee (RGPPC)_____
(name of party/amicus)

_____

 who is _____amicus curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.      Is party/amicus a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?      ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?      ☐ YES ☑ NO
        If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?      ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐ YES ☐ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: s/Charles J. Cooper                              Date: ___March 9, 2015___

Counsel for: Amicus Curiae RGPPC

## CERTIFICATE OF SERVICE
*****************************

I certify that on ___March 9, 2015___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

s/Charles J. Cooper                              ___March 9, 2015___
(signature)                                                      (date)

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................ ii

INTEREST OF AMICUS CURIAE .................................................. 1

INTRODUCTION ........................................................................ 1

SUMMARY OF ARGUMENT ....................................................... 2

ARGUMENT .............................................................................. 5

    I.    Extension of the Federal Wire-Fraud and Extortion Statutes to the Facilitation of Access to Government Officials Would Render Those Laws Unconstitutionally Vague............................ 6

        A.    If Extended to the Facilitation of Access, the Wire-Fraud and Extortion Statutes Would Not Provide Clear Notice of the Conduct that Is Prohibited. .......................................... 9

        B.    If Extended to the Facilitation of Access to Government Officials, the Wire-Fraud and Extortion Statutes Would Invite Arbitrary and Discriminatory Enforcement. ........... 13

    II.    Facilitation of Access to Government Officials Would Violate Principles of Lenity. ..................................................... 16

    III.    Extension of the Federal Wire-Fraud and Extortion Statutes to the Facilitation of Access to Government Officials Would Violate Established Constitutional Principles of Federalism....... 19

CONCLUSION ............................................................................ 25

i

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Bell v. United States*, 349 U.S. 81 (1955) ................................................................17

*Bond v. United States*, 134 S. Ct. 2077 (2014) ......................................................23

*Caron v. United States*, 524 U.S. 308 (1998) .........................................................19

*Citizens United v. FEC*, 558 U.S. 310 (2010).....................................................3, 6

*Cleveland v. United States*, 531 U.S. 12 (2000) ....................................................24

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) ..........................................9

*Coyle v. Smith*, 221 U.S. 559 (1911).......................................................................23

*Evans v. United States*, 504 U.S. 255 (1992).........................................................10

*FERC v. Mississippi*, 456 U.S. 742 (1982) ............................................................22

*Fry v. United States*, 421 U.S. 542 (1975)........................................................20, 22

*Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985)........................23

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..........................................13, 14

*Gregory v. Ashcroft*, 501 U.S. 452 (1991).......................................................*passim*

*Jones v. United States*, 529 U.S. 848 (2000) ..........................................................23

*Kolender v. Lawson*, 461 U.S. 352 (1983).........................................................14, 16

*McBoyle v. United States*, 283 U.S. 25 (1931) .......................................................17

*McCutcheon v. FEC*, 134 S. Ct. 1434 (2014) .....................................................3, 21

*McNally v. United States*, 483 U.S. 350 (1987).....................................................24

*National League of Cities v. Usery*, 426 U.S. 833 (1976) .................................22, 23

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) ...........................................22

*Northwest Airlines, Inc. v. Transport Workers Union of Am.*,
    451 U.S. 77 (1981)...............................................................................................18

*Rewis v. United States*, 401 U.S. 808 (1971).......................................4, 16, 17, 24

*Robers v. United States*, 134 S. Ct. 1854 (2014) ...................................................18

*Skilling v. United States*, 561 U.S. 358 (2010) ................................................*passim*

*Smith v. United States*, 508 U.S. 223 (1993) .........................................................18

*United States v. Bass*, 404 U.S. 336 (1971)................................................17, 23, 24

*United States v. Birdsall*, 233 U.S. 223 (1914)..................................................12, 13

*United States v. Derrick*, 163 F.3d 799 (4th Cir. 1998)....................................5

*United States v. Dimora*, 750 F.3d 619 (6th Cir. 2014)...................................9

*United States v. Enmons*, 410 U.S. 396 (1973).............................................24

*United States v. Gradwell*, 243 U.S. 476 (1917) ...........................................18

*United States v. Hairston*, 46 F.3d 361 (4th Cir. 1995)................................8, 9

*United States v. Harriss*, 347 U.S. 612 (1954) ..............................................21

*United States v. Hudson & Goodwin*, 11 U.S. 32 (1812) ............................18

*United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012) ............................13

*United States v. Loftus*, 992 F.2d 793 (8th Cir. 1993) .................................12

*United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978) .............................12

*United States v. Santos*, 553 U.S. 507 (2008)..............................2, 4, 17, 19

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999) .............11, 19

*United States v. Universal CIT Credit Corp.*, 344 U.S. 218 (1952).......................17

*United States v. Urciuoli*, 513 F.3d 290 (1st Cir. 2008) ...............................12

*Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007)..................................11, 12

## <u>Code and Rules</u>

18 U.S.C.

    § 1341......................................................................................................10

    § 1346......................................................................................................10

    § 1951......................................................................................................10

    § 1952......................................................................................................10

    § 201(a)(1) .............................................................................................9, 10

    § 201(a)(3) ..............................................................................................11

    § 201(b)(2) ..............................................................................................11

    § 666........................................................................................................10

    §§ 1961–1968..........................................................................................10

VA. CODE ANN.

    § 2.2-3103 ..............................................................................................21

iii

§§ 2.2-3113–3118.1 ...........................................................................21

FED. R. APP. P. 29.............................................................................1

## <u>Other</u>

*$18,000 Vacation Puts Kaine Atop Gift Recipients List*, THE WASHINGTON
    TIMES (Feb. 4, 2006), http://goo.gl/LJHzcb .................................... 16

Barry L. Van Lare, *The Governors' Offices*, *in* THE BOOK OF THE STATES:
    2009 (Council of State Governments 2009) .................................... 7

DAVID R. MAYHEW, CONGRESS: THE ELECTORAL CONNECTION (1974) ........... 8

Jim Geraghty, *Virginia's Long Tradition of Expensive Gifts to Governors*,
    NATIONAL REVIEW (Aug. 9, 2013), http://goo.gl/IBt5bs............................ 15

*Letters from The Federal Farmer*, in 2 HERBERT J. STORING, THE COMPLETE
    ANTIFEDERALIST 2.8.14 (1981) ........................................................ 22

Peter Nicholas, *Administration Officials Double as Obama Campaign
    Speakers*, L.A. TIMES (Nov. 16, 2011), *available at* http://goo.gl/
    pmc0SZ ........................................................................................... 8

*Rayner: The Trouble with Gifts*, RICHMOND TIMES-DISPATCH (Nov. 15, 2013),
    http://goo.gl/46HrYZ .................................................................... 16

Robert H. Jackson, *The Federal Prosecutor*, 31 J. CRIM. L. & CRIMINOLOGY
    3 (1940).......................................................................................... 15

THE FEDERALIST (C. Rossiter ed., 1961)

    No. 28 (Alexander Hamilton)....................................................... 22

    No. 45 (James Madison)............................................................... 19

    No. 78 (Alexander Hamilton)....................................................... 18

## INTEREST OF AMICUS CURIAE

The Republican Governors Public Policy Committee ("RGPPC") is a Section 501(c)(4) social welfare organization incorporated in the District of Columbia. Its members include all 31 Republican State Governors as well as the Republican Territorial Governors. The RGPPC's mission includes promoting social welfare and efficient and responsible government practices; advocating public policies that reduce the tax burdens on United States citizens, strengthen families, promote economic growth and prosperity, and improve education; and encouraging citizen participation in shaping laws and regulations relating to such policies.

All parties have consented to the filing of this brief. FED. R. APP. P. 29(a).[1]

## INTRODUCTION

Governor McDonnell's conviction rests on an interpretation of the federal wire-fraud and extortion laws that, if accepted, would strike at the heart of the States' sovereign integrity without any clear support in the language of those statutes at all. Indeed, so strained is the Government's reading that it flouts the ordinary standards of definiteness required by the Due Process Clause, much less

---

[1] No party's counsel authored any part of this brief; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person other than amicus curiae, its members, or its counsel contributed money intended to fund preparing or submitting the brief.  FED. R. APP. P. 29(c)(5).

1

the *extra*ordinary standards demanded of any attempt to interfere with those choices of a state that "go to the heart of representative government." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). Even worse, that reading would subject to harsh criminal punishment conduct "that is not clearly prescribed," *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality), in stark violation of traditional principles of lenity. The Government's reading of the federal laws in question, in other words, requires one to believe that Congress whispered opaquely in an area where our Constitution and traditions require a statement of the highest clarity.

One may question the wisdom or morality of all of the choices Governor McDonnell has made. But the very essence of the rule of law is that even the most emphatic conviction that a defendant *surely* did *something* wrong must yield to the limits embodied in our Constitution. By entering judgment against Governor McDonnell on the basis of an interpretation of federal bribery law that is patently flawed in these ways, the district court erred. It must be reversed, and Governor McDonnell's conviction must be vacated.

## SUMMARY OF ARGUMENT

Governor McDonnell was convicted for receiving things of value in return for agreeing to commit "official acts," but the specific actions the Governor took were not "official acts" as Congress has defined—or as the Supreme Court has understood—those terms. In fact, the five specific actions that were the legal basis

2

for this prosecution amounted to little more than facilitating an importunate constituent's access to other state policymakers—conduct that is extraordinarily commonplace. "Ingratiation and access," after all, "are not corruption." *Citizens United v. FEC*, 558 U.S. 310, 360 (2010). Indeed, they "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014) (plurality). The Government's attempt to read federal bribery law as criminalizing this type of everyday, everywhere conduct faces no fewer than three overriding difficulties—difficulties that go the heart of the structure of government that our Constitution establishes and the rights that it protects.

1.     The Government's interpretation would violate the protections of the Fifth Amendment's Due Process Clause. Because the Government's reading of the laws in question would attach criminal penalty to extraordinarily common conduct without any support in the language of the relevant statutes, it would violate that Clause's requirement that any conduct criminalized by federal law be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling v. United States*, 561 U.S. 358, 402 (2010). And because that interpretation would endow federal officials with an unparalleled amount of prosecutorial discretion in an area that is uniquely politically charged, it would

further violate due process by encouraging the "arbitrary and discriminatory enforcement" of federal bribery law. *Id.* at 402–03.

2.    The Government's reading of federal bribery law also violates longstanding principles of lenity. Both traditional requirements of fairness and the limits our constitutional system places on the role of the federal courts "require[ ] ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality). As shown below, the Government's interpretation of the wire-fraud and extortion statutes is implausible on its face and, in any event, foreclosed by the Constitution. But any doubt about that must "be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971).

3.    The Government's interpretation would also run afoul of deeply rooted principles of federalism. A State has the authority and responsibility to determine for itself the extent to which its officials should be allowed to accept gifts and provide constituents with access to other state policymakers, for such decisions are "of the most fundamental sort for a sovereign entity. Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). If Congress wishes to impose its own answers to questions like these, it must do so with unmistakable clarity. *Id.* It has done nothing of the sort.

4

## ARGUMENT

To establish that Governor McDonnell violated the federal wire-fraud and extortion statutes, the Government had to prove both that he received one or more things of value and that he accepted those things of value in return for agreeing to commit "official acts." There is no question that Governor McDonnell accepted several things of value from Jonnie Williams and that he exercised poor judgment in doing so, notwithstanding that it was entirely legal under Virginia law.  But a lapse in judgment of this kind does not violate federal bribery law unless the Government also proves the "official act" element.  Indeed, the "thing of value" element is rarely a difficult one to satisfy. Since mere campaign contributions can be the "thing of value" in a federal bribery prosecution, *United States v. Derrick*, 163 F.3d 799, 816–17 (4th Cir. 1998), in many cases—as in Governor McDonnell's—the "official act" element may be the only one with any bite. And in this case, Governor McDonnell's conviction was based on an interpretation of the "official act" requirement that effectively reads it out of the statute. Congress has not commanded such an intolerable result, at least not clearly and unambiguously. And interpreting what Congress *has* said in this way faces three overwhelming difficulties of constitutional proportion.

**I.** **Extension of the Federal Wire-Fraud and Extortion Statutes to the Facilitation of Access to Government Officials Would Render Those Laws Unconstitutionally Vague.**

Governor McDonnell was convicted in part for taking actions that, in the main, are indistinguishable from actions that nearly every elected official in the United States takes nearly every day. We emphasize that our focus here is not on the *quid*—what Governor McDonnell accepted—or the *pro*—the alleged agreement between Governor McDonnell and Mr. Williams—but rather on the *quo*—the particular acts that formed the basis of Governor McDonnell's conviction. Rather than show that the Governor actually ordered or influenced state officials to do what Mr. Williams really wanted—perform state-sponsored studies of Anatabloc, a dietary supplement sold by Mr. Williams' Company—the Government relied on such mundane conduct as attending a luncheon at the Governor's Mansion with Mr. Williams and setting up a meeting between Mr. Williams and a staff member from the Department of Health and Human Resources. These actions amount to nothing more than facilitating Mr. Williams' access to other state officials.  But "[i]ngratiation and access," the Supreme Court has emphasized, "are not corruption." *Citizens United v. FEC*, 558 U.S. 310, 360 (2010).

Indeed, far from "corruption," such facilitation of access is extraordinarily commonplace. As an organization of 31 state Governors, Amicus can attest that

6

state chief executives are inundated by requests from constituents or interest groups to meet with them or someone working elsewhere in state government. Such requests "come to the governor by mail, e-mail, telephone and personal visits," and are so numerous that many Governors have a "correspondence staff" that serves "as a referral mechanism seeing that constituent service requests are referred to state agencies for necessary action." Barry L. Van Lare, *The Governors' Offices*, *in* THE BOOK OF THE STATES: 2009 180, 181–82 (Council of State Governments 2009).

The records recently released from Jeb Bush's term as Governor of Florida provide a concrete example of the ubiquity of most of the actions for which Governor McDonnell was convicted. In January of 2003 alone, Governor Bush received 31 emails from individual constituents or groups—an average of one per day—requesting a meeting with him or someone in his administration. The following month, he received 50 such meeting requests. He set up many of these requested meetings, and specifically followed up eighteen times during the two months to confirm that a scheduled meeting had taken or would take place.[2]

---

[2] We determined the numbers in the text by downloading Governor Bush's email records from both January and February 2003 in their native Microsoft Outlook format from http://americanbridgepac.org/jeb-bushs-gubernatorial-email-archive, and searching them for the term "meet." This search produced all emails containing a variation of the term. We then reviewed each of the results to determine if a constituent or group requested a meeting with Governor Bush; we also documented instances in which Governor Bush verified that a meeting was

Indeed, facilitating "access" is a central part of *any* modern elected official's job. For example, in 2012 President Obama's campaign reportedly had a "Speaker Series" program which "turn[ed] Cabinet secretaries and top White House advisors into fundraising surrogates. For $5,000, a donor can get a kind of season pass to see [Cabinet Secretaries and White House advisors] when they come to town." Peter Nicholas, *Administration Officials Double as Obama Campaign Speakers*, L.A. TIMES (Nov. 16, 2011), *available at* http://goo.gl/pmc0SZ. And even off the campaign trail, a large proportion of any politician's time is spent attending ceremonial luncheons and receptions and setting up meetings for constituents or influential groups. *See* DAVID R. MAYHEW, CONGRESS: THE ELECTORAL CONNECTION 53–59 (1974) (describing the ubiquity of "constituency service").

The consequences, then, of broadening the definition of "official act" to include the mundane facilitation of access would be breathtaking: if granting a request for access of this kind counted as an "official act," potentially every elected official in the nation would be in danger of indictment by an overzealous federal prosecutor. To be sure, the prosecutor would be required to show the existence of a quid pro quo to obtain a conviction. But even in the campaign contribution context, the quid pro quo requirement "is not onerous" and can be implied from conduct.

---

scheduled or had already been completed. Subsequent to our research, the Microsoft Outlook file containing Governor Bush's emails was removed from this website, and it is no longer available online.

*United States v. Hairston*, 46 F.3d 361, 365 (4th Cir. 1995). In other words, under the Government's theory the only thing standing between our Nation's elected officials and a potential bribery conviction is prosecutorial discretion and "how a jury of twelve may assess the question of [the official's] subjective intent" in facilitating a supporter's access to government officials. *United States v. Dimora*, 750 F.3d 619, 633 (6th Cir. 2014) (Merritt, J., dissenting).

This the Constitution will not tolerate. That document requires as "the first essential of due process of law," *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926), that any criminal law "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement," *Skilling v. United States*, 561 U.S. 358, 402–03 (2010) (alterations in original) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The Government's reading of the wire-fraud and extortion statutes would violate the Fifth Amendment's Due Process Clause on both scores.

### A.    If Extended to the Facilitation of Access, the Wire-Fraud and Extortion Statutes Would Not Provide Clear Notice of the Conduct that Is Prohibited.

A conscientious state official must traverse a tortuous path through the United States Code even to *discover* that his or her conduct is regulated by federal bribery law. Because the federal bribery statute applies only to *federal officials*, 18

9

U.S.C. § 201(a)(1), federal prosecutors have been able to impose the federal regime on state officials only by taking a detour through two other statutes, both of whose application to bribery is, as a matter of first principles, far from clear.[3]  The wire-fraud statute's opaque bar on interstate schemes "to deprive another of the intangible right of honest services," *id.* §§ 1341, 1346, includes bribery only because the Supreme Court interpreted it as doing so in order to cabin its vagueness, *see Skilling*, 561 U.S. at 403–13. And while the Hobbs Act criminalizes extortion "under color of official right," 18 U.S.C. § 1951, there is strong evidence that Congress understood this crime as limited to situations in which "money or property [are] obtained . . . under the pretense that the officer was *entitled* thereto by virtue of his office," *see Evans v. United States*, 504 U.S. 255, 279–84 (1992) (Thomas, J., dissenting) (emphasis altered), and it today applies to ordinary bribery only because a majority of a divided Supreme Court rejected this limitation, *id.* at 260–71 (majority opinion).

The federal wire-fraud and extortion statutes, then, incorporate federal bribery law only because the courts have adopted contested interpretations of those statutes. The Government would now effectively do away with a critical limitation

---

[3] In addition to the wire-fraud and extortion statutes, state and local officials might be liable for the federal crime of bribery by way of the Travel Act, 18 U.S.C. § 1952, the federal-programs bribery act, 18 U.S.C. § 666, or RICO, 18 U.S.C. §§ 1961–1968. Governor McDonnell was not charged under any of these statutes.

10

on federal bribery law's expanding reach: the "official act" requirement. 18 U.S.C. § 201(b)(2). But Congress's own definition of that key term underscores its narrowness: not all actions that are " 'official acts' in some sense" are " 'official acts' within the meaning of the statute," *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999), a class that includes only those "decision[s] or action[s]" which a public official takes on a "question, matter, cause, suit, proceeding or controversy, which may at any time be pending" before the official in his "official capacity," 18 U.S.C. § 201(a)(3). Far from including such mundane, everyday activities as setting up meetings or attending luncheons, that narrow definition of "official act" fairly includes only actions on questions "that the government had authority to decide," or "decisions that the government actually makes." *Valdes v. United States*, 475 F.3d 1319, 1324–25 (D.C. Cir. 2007) (en banc). Indeed, both the Supreme Court and three of this court's sister circuits have read the "official act" requirement in this sensible, limited way.

In *Sun-Diamond*, for example, the Supreme Court rejected as "absurd[ ]" an interpretation of "official act" that "would criminalize, for example, token gifts to the President . . . such as the replica jerseys given by championship sports teams each year during ceremonial White House visits" or "a high school principal's gift of a school baseball cap to the Secretary of Education . . . on the occasion of the latter's visit to the school." 526 U.S. at 406–07. Similarly, in *Valdes*, the D.C.

11

Circuit, sitting en banc, refused to count as an "official act" a police officer's search of police databases for publicly available information, reasoning that such an interpretation would read the narrow definition of "official act" "out of the statute entirely." 475 F.3d at 1320, 1322–23. The First Circuit has come to the same conclusion, interpreting "official act" as excluding a state legislator's informal advocacy on behalf of a local business, even though that advocacy "traded in part on the reputation, network and influence that comes with political office," because "there is no indication that [the legislator] invoked any purported oversight authority or threatened to use official powers in support of his advocacy." *United States v. Urciuoli*, 513 F.3d 290, 296 (1st Cir. 2008). And in *United States v. Rabbitt*, the Eighth Circuit likewise reversed a conviction for extortion where the defendant, a state Speaker of the House, did no more than use his influence to "gain" a longstanding friend "a friendly ear" with other state officials. 583 F.2d 1014, 1028 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States,* 483 U.S. 350, 356 (1987); *see also United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (noting that in *Rabbitt* the defendant "promised only to introduce the [other party] to influential persons; he did not promise to use his official position to influence those persons").

Though the Government pretends differently, *United States v. Birdsall*, 233 U.S. 223 (1914), is not to the contrary—in fact, it is not even to the point. Indeed,

12

this Court has already stated that "we agree with *Sun-Diamond* and *Valdes* that the bribery statute does not encompass every action taken in one's official capacity, and we also agree with *Valdes* that *Birdsall* did not so hold." *United States v. Jefferson*, 674 F.3d 332, 356 (4th Cir. 2012). Instead, *Birdsall* merely held that "official acts" extend beyond those "prescribed by statute" or "by a written rule or regulation," to acts "clearly established by settled practice" as part of the defendant's official duties. 233 U.S. at 230–31. *Birdsall* simply does not, as the Government intimates, hold that *all* actions that are part of an office's "established usages and practices," *id.* at 229, count as "official acts."

It is conceivable, of course, that each of these courts erred in concluding that Congress did not mean for the term "official act" to cover mundane actions like the ones in this case. But what does not seem in doubt—and what matters for the purposes of the Due Process Clause—is that even if Congress *did* mean to proscribe conduct like this, it did not do so "with sufficient definiteness that ordinary people can understand what conduct is prohibited." *Skilling*, 561 U.S. at 402 (quoting *Kolender*, 461 U.S. at 357).

**B.    If Extended to the Facilitation of Access to Government Officials, the Wire-Fraud and Extortion Statutes Would Invite Arbitrary and Discriminatory Enforcement.**

The Due Process Clause's bar on vague criminal laws not only protects against laws that "trap the innocent by not providing fair warning." *Grayned v.*

13

*City of Rockford*, 408 U.S. 104, 108 (1972). It also ensures that the "legislature establish[es] minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). A vague statute, lacking such "minimal guidelines," threatens to "permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Id.* (alteration in original) (quoting *Smith*, 415 U.S. at 575). The federal wire-fraud and extortion statutes, shorn of any meaningful "official act" limitation in the way the Government urges, would invite just such arbitrary and discriminatory enforcement.

The statutes in question would, on the Government's reading, strike arbitrarily in practice precisely because they would strike *everyone* in theory. If setting up a meeting for an interest group is an "official act" potentially giving rise to federal criminal liability if that group happens to have recently given something of value—including, it must be stressed, a campaign contribution—then, as shown above, there may not be a single elected official in the nation who is not at risk of prosecution. Unconstrained by any legal standards, federal prosecutors will be left free to pursue "their personal predilections," *id.*, in determining which officials to pursue.

This boundless discretion is made all the more intolerable by the political dynamics latent in any bribery prosecution. Justice Jackson, in a passage that has

14

encapsulated for many the perils of prosecutorial discretion, wrote that "the most

dangerous power of the prosecutor" is "that he can choose his defendants," and

might in doing so be tempted to

> pick people that he thinks he should get, rather than pick cases that need
> to be prosecuted. . . . It is here that law enforcement becomes personal,
> and the real crime becomes that of being unpopular with the
> predominant or governing group, being attached to the wrong political
> views, or being personally obnoxious to or in the way of the prosecutor
> himself.

Robert H. Jackson, *The Federal Prosecutor*, 31 J. CRIM. L. & CRIMINOLOGY 3, 5

(1940). There is perhaps no context where Justice Jackson's warning has greater

force than this one. The most salient characteristic of each of the elected officials

in the slate from which federal prosecutors are invited to "choose their

defendants," after all, may well be the letter that comes in parentheses after their

name.

　　This risk that federal bribery prosecution will be politically motivated—or

perceived as such—is very real, not hypothetical. For example, Governor

McDonnell's immediate predecessor in office, Governor Tim Kaine—a

Democrat—reported receiving $186,899 in gifts since he was first elected to

statewide office in 2001. Jim Geraghty, *Virginia's Long Tradition of Expensive

Gifts to Governors*, NATIONAL REVIEW (Aug. 9, 2013), http://goo.gl/IBt5bs. In

2005, for example, shortly before taking office as Governor, then-Lt. Governor

Kaine accepted a ten-day stay, valued at $18,000, at the Caribbean island home of

15

his campaign supporter, James B. Murray Jr., a Virginia businessman. *$18,000 Vacation Puts Kaine Atop Gift Recipients List*, THE WASHINGTON TIMES (Feb. 4, 2006), http://goo.gl/LJHzcb. After assuming office the following year, Governor Kaine reappointed Mr. Murray to a position on a state commission. *Rayner: The Trouble with Gifts*, RICHMOND TIMES-DISPATCH (Nov. 15, 2013), http://goo.gl/46HrYZ. The year after that, "Kaine received gifts worth $3,237 for travel" from another state businessman, "whom Kaine just happened to name as deputy secretary of transportation that very year." *Id.*

On the Government's reading, of course, the determination that Governor McDonnell's conduct merits a bribery prosecution while Governor Kaine's does not is one that Congress left to federal prosecutors—guided by little more than "their personal predilections," *Kolender*, 461 U.S. at 358. Tasked with striving "to construe, not condemn, Congress' enactments," *Skilling*, 561 U.S. at 403, this Court should not presume that Congress stepped so far over the void-for-vagueness line.

## II. Extension of the Federal Wire-Fraud and Extortion Statutes to the Facilitation of Access to Government Officials Would Violate Principles of Lenity.

As already shown, the language of the wire-fraud and extortion statutes and the protections afforded by our Constitution make the Government's reading simply unsupportable. But "even if this lack of support were less apparent,

16

ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812 (1971). Whatever else it may be, the application of federal bribery law to mundane conduct like attending luncheons and setting up meetings is not "clear and definite." *United States v. Universal CIT Credit Corp.*, 344 U.S. 218, 222 (1952). And this Court must "not derive criminal outlawry from some ambiguous implication." *Id.*

The rule of lenity "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them," *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality); *see also id.* at 528 (Stevens, J., concurring in judgment), but not "out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or anti-social conduct." *Bell v. United States*, 349 U.S. 81, 83 (1955). Rather, the "principle is founded on two policies," which not only "have long been part of our tradition," *United States v. Bass*, 404 U.S. 336, 348 (1971), but are embedded in the Constitution itself.

First, "it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). This is "a presupposition of our law." *Bell*, 349 U.S. at 83. But more than that, it is grounded in the very same "due process essentials," *Skilling*, 561 U.S. at 403, that undergird the vagueness doctrine just discussed.

17

Second, principles of lenity flow from the Constitution's separation of powers. Convinced that "there is no liberty, if the power of judging be not separated from the legislative and executive powers," THE FEDERALIST NO. 78, at 467 (Alexander Hamilton) (C. Rossiter ed., 1961), the Framers vested "the federal lawmaking power . . . in the legislative, not the judicial, branch of government," *Northwest Airlines, Inc. v. Transport Workers Union of Am.*, 451 U.S. 77, 95 (1981). And it was settled early on that these limits deprive the federal courts of any power to create a common law of crimes. *United States v. Hudson and Goodwin*, 11 U.S. 32, 34 (1812). Imposing criminal liability on conduct not "plainly and unmistakably within the provisions of some statute," *United States v. Gradwell*, 243 U.S. 476, 485 (1917) (internal quotation marks omitted), would violate these settled limits.

To be sure, "[t]he mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable." *Smith v. United States*, 508 U.S. 223, 239 (1993). "Instead, that venerable rule is reserved for cases where, '[a]fter seiz[ing] every thing from which aid can be derived,' the Court is 'left with an ambiguous statute.'" *Id.* (alterations in original) (quoting *Bass*, 404 U.S. at 347 (internal quotation marks omitted)). But here, none of "the usual tools of statutory construction," *Robers v. United States*, 134 S. Ct. 1854, 1859 (2014), offers any support to the Government's interpretation. As shown above, the text of the

18

relevant statutes strongly militates *against* the Government's strained reading. *See supra* pp. 10–13. And as the Supreme Court has held, "the numerous other regulations and statutes" governing the ethics of government officials strongly suggest that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Sun-Diamond*, 526 U.S. at 412. Accordingly, it is *the Government*'s interpretation, not Governor McDonnell's, that "is an implausible reading of the congressional purpose." *Caron v. United States*, 524 U.S. 308, 316 (1998).

For all of these reasons, the federal wire-fraud and extortion statutes *clearly do not* cover the actions Governor McDonnell was convicted for taking. But in any event, those statutes *do not clearly* cover those acts, and under our traditions, any "tie must go to the defendant." *Santos*, 553 U.S. at 514.

### III. Extension of the Federal Wire-Fraud and Extortion Statutes to the Facilitation of Access to Government Officials Would Violate Established Constitutional Principles of Federalism.

"[O]ur Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). "The powers delegated by the . . . Constitution to the federal government are few and defined. Those which . . . remain in the State governments are numerous and indefinite." THE FEDERALIST NO. 45, at 292 (James Madison) (C. Rossiter ed., 1961). By preserving two levels of sovereign government in this way,

the Framers sought to secure a number of advantages: accommodating local diversity, promoting experimentation, and safeguarding individual liberty. Crucially, however, for federalism to yield any of these benefits, Congress must not be allowed to "impair[ ] the States' integrity or their ability to function effectively in a federal system," *Fry v. United States*, 421 U.S. 542, 547 n.7 (1975), unless it makes its intent to do so "unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460.

The Government's reading of federal bribery and extortion law would risk criminalizing conduct that is a central part of every state chief executive's job: attending social events, setting up meetings, and emailing staff members. For this reason, it runs afoul of not only the Constitution's guarantees of fair notice and non-arbitrary treatment, but also the very structure of government that that document establishes. By determining "the character of those who exercise government authority, a State defines itself as a sovereign," and if Congress wishes to interfere with such choices, it "must make its intention to do so 'unmistakably clear,' " *Gregory*, 501 U.S. at 460 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 75 (1989)). The federal statutes Governor McDonnell was convicted of violating do not even approach this level of clarity.

Facilitating constituents' access to government officials is one way in which elected officials can keep open the lines of communication that bind them to the

20

interests of those they represent. The facilitation of access for political supporters "embod[ies] a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1441 (2014). Of course, allowing the unbridled exchange of money for "general gratitude" is not without risk; if "ingratiation and access" flow without any scrutiny, "the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal." *United States v. Harriss*, 347 U.S. 612, 625 (1954). But it is surely for the State in the first instance to draw the line between these two interests. And in doing so, the State defines in the most fundamental way the relationship between its citizens and their representatives.

For example, within the bounds set by the Constitution, a state is free to regulate the exchange of money for access through disclosure laws or laws limiting the receipt of gifts. Virginia has enacted both of these types of restrictions, *see* VA. CODE ANN. §§ 2.2-3103, 2.2-3113–3118.1, and as the district court noted, "[t]here has been no suggestion in this case" that Governor McDonnell violated them, Tr. Vol. XXVI , at 6125:17–19. But by calibrating the extent to which state residents can seek—and state officials can grant—access to state policymakers, Virginia defined the very nature of the representative relationship between its citizens and

21

those who wield power in their name. And since the authority to define this relationship is in this way part of "what gives the State its sovereign nature," *FERC v. Mississippi*, 456 U.S. 742, 761 (1982), Congress can impose its own, different definition only if it does so with unmistakable clarity, *Gregory*, 501 U.S. at 460.

The Framers established a federal republic in order to secure a number of advantages: accommodating diversity, *see Letters from The Federal Farmer*, *in* 2 HERBERT J. STORING, THE COMPLETE ANTIFEDERALIST 2.8.14 (1981); encouraging experimentation, *see New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting); and checking the abuse of power, *see* THE FEDERALIST NO. 28, at 181 (Alexander Hamilton) (C. Rossiter ed., 1961). But it is an essential precondition for any of these benefits that each State be left free so far as possible to "define[ ] itself as a sovereign" by making decisions about the "structure of its government, and the character of those who exercise government authority." *Gregory*, 501 U.S. at 460. For federal interference with such decisions "impairs the States' integrity [and] their ability to function effectively in a federal system." *Fry*, 421 U.S. at 547 n.7.

Accordingly, for over a century, the Supreme Court has "recognized that there are attributes of sovereignty attaching to every state government which may not be impaired by Congress." *National League of Cities v. Usery*, 426 U.S. 833, 845 (1976), *overruled by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S.

22

528 (1985); *see also Coyle v. Smith*, 221 U.S. 559, 565 (1911). To be sure, the Court has concluded that "the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself," which gives "the States a role in the selection both of the Executive and the Legislative Branches of the Federal Government." *Garcia*, 469 U.S. at 550–51. But these structural protections would be illusory if preemptive legal force were granted to choices that Congress nowhere explicitly made. "[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." *Gregory*, 501 U.S. at 464 (alteration in original) (quoting Laurence Tribe, American Constitutional Law 480 (2d ed. 1988)).

The Supreme Court has thus held that Congress may upset "state decisions that go to the heart of representative government" only if it "make[s] its intention to do so unmistakably clear in the language of the statute." *Id.* at 460–61 (internal quotation marks omitted). And the Court has time after time wielded this clear-statement rule to whittle down expansive interpretations of federal criminal statutes that "would significantly change [ ] the federal-state balance." *Bond v. United States*, 134 S. Ct. 2077, 2089–90 (2014) (alteration in original) (internal quotation marks omitted); *see also Jones v. United States*, 529 U.S. 848, 858 (2000) (federal arson statute); *Bass*, 404 U.S. at 349 (possession of firearm in interstate

23

commerce); *Rewis*, 401 U.S. at 811–12 (travel act). Indeed, the Court has taken the scalpel to both the federal mail fraud and extortion statutes. *Cleveland v. United States*, 531 U.S. 12, 24–25 (2000) (declining to "subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities"); *McNally v. United States*, 483 U.S. 350, 360 (1987) (refusing to "construe the [mail fraud] statute in a manner that . . . involves the Federal Government in setting standards of disclosure and good government for local and state officials"), *superseded by* Pub. L. No. 100-690, 102 Stat. 4508 (1988); *United States v. Enmons*, 410 U.S. 396, 410–11 (1973) (rejecting a "broad concept of extortion" that would work "an unprecedented incursion into the criminal jurisdiction of the States").

The Government's interpretation of federal bribery law in this prosecution must meet the same fate. Because it would impose overriding federal answers to questions that go to the heart of Virginia's definition of representative government, the Government's interpretation of the extortion and wire-fraud statutes can be accepted only if it follows from the text of those laws with unmistakable clarity. But as demonstrated above, those statutes fall so far short of unambiguously supporting the Government's interpretation that reading them the Government's way would raise severe vagueness concerns. On the Government's view, in other words, Congress has spoken with *less* than ordinary clarity on a topic that demands

24

*greater* than ordinary clarity. The Constitution will not tolerate such an interpretation of the federal extortion and wire-fraud statutes, and this Court should not adopt it.

## CONCLUSION

As shown above, the Government's strained interpretation of the "official act" requirement ignores Congress's own definition of that term, violates the rule of lenity, and upends the basic structure of our federalist system. Accordingly, the district court's judgment should be reversed, and Governor McDonnell's conviction should be vacated.

Date: March 9, 2015

Respectfully submitted,

<u>s/ Charles J. Cooper</u>
Charles J. Cooper
David H. Thompson
Peter A. Patterson
John D. Ohlendorf
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C.  20036
(202) 220-9600
ccooper@cooperkirk.com

*Counsel for Amicus Curiae*

25

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of FED R. APP. P. 29(d) and 32(a)(7)(B) because this brief contains 5,935 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements on FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word 2013 in 14-point Times New Roman font.

Date: March 9, 2015

s/ Charles J. Cooper
Charles J. Cooper

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on March 9, 2015, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


Date: March 9, 2015                                    s/ Charles J. Cooper
                                                       Charles J. Cooper

                                                       *Counsel for Amicus Curiae*